# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

JESSICA M. COLOTL COYOTL,

     **Plaintiff,**

v.

JOHN F. KELLY, Secretary,
Department of Homeland Security;
MARK J. HAZUDA, Director,
Nebraska Service Center, U.S.
Citizenship and Immigration
Services; JAMES McCAMENT,
Acting Director, U.S. Citizenship and
Immigration Services; THOMAS D.
HOMAN, Acting Director, U.S.
Immigration and Customs
Enforcement; and SEAN W.
GALLAGHER, Atlanta Field Office
Director, U.S. Immigration and
Customs Enforcement,

     **Defendants.**

**CIVIL ACTION FILE**

**NO. 1:17-CV-1670-MHC**

## ORDER

This case comes before the Court on Plaintiff Jessica M. Colotl Coyotl's

Emergency Motion for a Temporary Restraining Order and/or for a Preliminary

Injunction [Doc. 14] ("Pl.'s Mot."). Plaintiff seeks an order from this Court that

temporarily enjoins the revocation of her deferred action immigration status under

the Deferred Action for Childhood Arrivals ("DACA") program pending an

eligibility determination that comports with the Administrative Procedure Act

("APA") and the Due Process Clause of the Fifth Amendment. First Am. Compl.

For Declaratory & Injunctive Relief [Doc. 8] ("Am. Compl.") ¶¶ 74-85.

## I.  BACKGROUND

### A.  Plaintiff Jessica Colotl

Plaintiff is a twenty-eight-year-old citizen of Mexico, who has lived

continuously in the United States since she first entered here without inspection in

1999 when she was eleven years old. Decl. of Jessica M. Colotl Coyotl dated May

22, 2017 [Doc. 14-2] ("Colotl Decl.") ¶ 1; Am. Compl. ¶ 17. She graduated from

Lakeside High School in DeKalb County, Georgia, in May 2006, with honors.

Colotl Decl. ¶ 2. She then earned a bachelor's degree in political science from

Kennesaw State University in 2011, where she was named to the President's List

for her academic performance. Id. ¶¶ 3-4. While attending college, she was active

in several student organizations, including the Hispanic Scholarship Fund and the

Mexican American Student Alliance. Id. ¶ 3. She also helped found the Epsilon

Alpha Chapter of the Lambda Theta Alpha sorority, an organization dedicated to

the needs of Latinas and women. Id.

Since graduating, Plaintiff has worked at a local law firm and aspires to

attend law school and become an immigration lawyer. Id. ¶ 5. She has also

2

continued to remain active in the community, volunteering for the Annual Latino Youth Leadership Conference, donating blood platelets at Northside Hospital in Atlanta, Georgia, and fundraising for St. Jude Children's Hospital. Id. ¶¶ 6-7. She is also a member of a church in Norcross, Georgia and remains active in her sorority. Id. ¶¶ 6-7. Plaintiff has advocated for immigration reform locally and in Washington, D.C. Id. ¶ 8.

**B.    Plaintiff's Arrest and Criminal Proceeding**

On March 29, 2010, Plaintiff was pulled over by campus police for allegedly blocking traffic while waiting for a parking space. Id. ¶ 9; Am. Compl. ¶ 47. She had no driver's license because she is ineligible to obtain one in Georgia due to her immigration status. Colotl Decl. ¶ 9. The next day, Plaintiff was arrested on charges of impeding the flow of traffic and driving without a license, and booked into the Cobb County jail. Id. ¶ 10; Am. Compl. ¶ 48. After a jury trial, Plaintiff was acquitted of impeding the flow of traffic, but found guilty of the misdemeanor offense of driving without a license, for which she served three days in jail and paid a fine. Colotl Decl. ¶ 10; Am. Compl. ¶ 48.

In February 2011, Plaintiff was indicted for allegedly making a false statement during the process whereby she was booked into the Cobb County jail on the earlier traffic violation charges. Colotl Decl. ¶ 11; Am. Compl. ¶ 52. It was

alleged that Plaintiff knowingly provided a false address during booking; although she never told an officer her address, an officer recorded address information from a vehicle insurance card that the officer took from her purse. Colotl Decl. ¶¶ 11-12. The address the officer recorded from Plaintiff's insurance card was, in fact, her correct permanent home address at that time. Id. ¶ 13. Her parents moved from that address one month later, in April 2010. Id.

Plaintiff entered a plea of not guilty to the false statement charge and the District Attorney offered her the option of entering into a pre-trial diversion program as an alternative to prosecution, whereby she would not be required to enter a guilty plea and the charge would be dismissed upon completion of her community service. Id. ¶ 14; Am. Compl. ¶ 52. Plaintiff elected to enter the diversion program and signed a "Diversion Agreement" containing a statement acknowledging that her participation in the program constituted an admission of guilt to the charge against her. Diversion Agreement [Doc. 14-25] at 84-87. Plaintiff successfully completed the diversion program, and the false statement charge was dismissed in January 2013. See Order dated Jan. 9, 2013 [Doc. 14-4] (dismissing criminal case against Plaintiff). Plaintiff has no other criminal history. Colotl Decl. ¶ 18.

## C. Plaintiff's Removal Proceeding

After Plaintiff's arrest in March 2010, she was referred to U.S. Immigration and Customs Enforcement ("ICE"), which initiated removal proceedings. Id. ¶ 19; Am. Compl. ¶¶ 55-56. Plaintiff was placed in immigration detention during the removal proceedings, where she was detained for approximately one month. Colotl Dec. ¶ 20. On April 28, 2010, she accepted an order of voluntary departure, which permitted her to leave the United States within thirty days without the entry of a deportation order. Id. ¶ 21; Am. Compl. ¶ 57. After receiving her voluntary departure order, Plaintiff was granted deferred action status by the U.S. Department of Homeland Security ("DHS"), resulting in her release from detention and allowing her to remain in the United States to complete her undergraduate degree. Colotl Decl. ¶ 22; Am. Compl. ¶ 58.

On July 15, 2014, Plaintiff moved the immigration court to reopen her removal proceeding and administratively close the case. See Decision of Board of Immigration Appeals ("BIA") dated Oct. 6, 2016 [Doc. 14-11] ("BIA Decision"); Am. Compl. ¶ 59. The immigration judge denied her request on January 26, 2015, and Plaintiff appealed. BIA Decision; Am. Compl. ¶ 60. The BIA sustained Plaintiff's appeal, reversed the immigration judge's decision, reopened Plaintiff's removal proceeding, and remanded the case to the immigration court for

5

administrative closure. BIA Decision; Am. Compl. ¶ 60. Although her immigration case was remanded to the immigration court on October 6, 2016, with an order to administratively close the case, no action has been taken to close that case and it remains pending as of the date of this Order. Am. Compl. ¶ 61. On March 29, 2017, ICE counsel filed a brief in opposition to Plaintiff's motion to reopen her removal proceeding and administratively close her case, making the following argument: "[O]n February 20, 2017, the Department [of Homeland Security] issued a memorandum, titled 'Enforcement of the Immigration Laws to Serve the National Interest.' Due to the respondent's criminal history, she is an enforcement priority under this memorandum." DHS's Suppl. Br. on Eligibility for Relief [Doc. 14-12] (filed in Plaintiff's removal proceeding) at 3.

### D.    Plaintiff's Deferred Action Status From 2010-2017

Plaintiff has been on deferred action status from May 5, 2010, until May 3, 2017, the last four years of which have been under the DACA program. Colotl Decl. ¶ 22; Am. Compl. ¶ 17. Plaintiff first received deferred status under DACA on July 1, 2013. Colotl Decl. ¶ 29. She applied for and received a renewal of her DACA status on May 19, 2015, which remained valid through May 18, 2017. Id. Plaintiff also applied for and received work authorization in conjunction with the grants of deferred action and DACA. Id. ¶ 30. Each of Plaintiff's applications for

6

DACA disclosed all relevant information regarding her criminal history, including a copy of her pre-trial diversion agreement. Id. ¶ 32.

Plaintiff's latest application for a renewal of her DACA status and work authorization was submitted on December 19, 2016. Id. ¶ 31. On May 2, 2017, Plaintiff's renewal application was denied. Id. ¶ 33; Am. Compl. ¶ 69. Although Plaintiff did not receive notice on May 2, 2017, that her DACA renewal application was denied, DHS's website that day indicated that her DACA renewal application was denied and that a decision notice was mailed to her "that explains why we denied your case and your options." Screenshot of U.S. Citizen and Immigration Services ("USCIS") website [Doc. 19-2].

Subsequently, on May 3, 2017, USCIS issued a notice of termination of Plaintiff's DACA status and employment authorization. See Termination Notice [Doc. 1-11] at 7, attached as an Ex. to DHS's Second Suppl. Br. in Pl.'s removal proceeding; Colotl Decl. ¶ 34. The May 3, 2017, Termination Notice provided that: "USCIS has determined that exercising prosecutorial discretion in your case is not consistent with the Department of Homeland Security's enforcement priorities." Termination Notice; Colotl Decl. ¶ 34; Am. Compl. ¶ 70. The Termination Notice did not contain any further explanation of the decision and

made no reference to the denial of Plaintiff's DACA renewal application one day earlier.[1]  Termination Notice; Colotl Decl. ¶ 34; Am. Compl. ¶ 70.

On May 8, 2017, USCIS issued a "Decision" as to Plaintiff's DACA renewal application indicating that her "previous request for DACA was terminated on May 3, 2017," and stating that "USCIS has determined, in its unreviewable discretion, that you have not demonstrated that you warrant a favorable exercise of prosecutorial discretion and it will not defer action in your matter."  Decision [Doc. 18-2].  Plaintiff has been provided no opportunity to contest either the May 3, 2017, Termination Notice or the May 8, 2017, Decision.

### E.    The DACA Program

On June 15, 2012, former Secretary of Homeland Security Janet Napolitano announced the creation of the DACA program.  Memorandum from Janet Napolitano dated June 15, 2012 [Doc. 14-14] ("Napolitano Memo").  In her memorandum, Napolitano provided DHS with guidelines regarding the exercise of

---

[1] Several media outlets previously reported that a USCIS spokesperson publicly stated that Plaintiff's DACA status was terminated because of her guilty plea associated with her entry into the pre-trial diversion program. See, e.g., Kate Brumback, Protection from Deportation Revoked for Former Cause Celebre, Associated Press, May 10, 2017 [Doc. 14-28]; Jeremy Redmon, Trump Administration Strips Georgia Woman of Reprieve from Deportation, Atlanta Journal-Constitution, May 10, 2017 [Doc. 14-29].  However, Defendants now acknowledge that "Plaintiff's pre-trial diversion agreement was not a conviction for immigration purposes." Mem. of Law in Opp'n to Pl.'s Mot. [Doc. 18] ("Defs.' Resp.") at 17 n.10.

its prosecutorial discretion to focus enforcement efforts away from low priority

cases, including individuals who came to the United States as children. Id. The

Napolitano Memo listed the following five criteria that must be satisfied before an

individual can be considered for an exercise of prosecutorial discretion under

DACA:

- came to the United States under the age of sixteen;

- has continuously resided in the United States for a least five years preceding the date of this memorandum and is present in the United States on the date of this memorandum;

- is currently in school, has graduated from high school, has obtained a general education development certificate, or is an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- has not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or otherwise poses a threat to national security or public safety; and

- is not above the age of thirty.

Id. Individuals must also pass a criminal background check to be eligible for

DACA. Id. at 2. Under the DACA program, deferred action is provided for a

renewable period of two years, and DACA recipients are eligible to apply for work

authorization during the period of deferred action. Id. at 3; see also 8 C.F.R.

§ 274a.12(c)(14) (permitting USCIS to establish a specific period for employment authorization for aliens who have been granted deferred action).

The National Standard Operating Procedures ("SOP") issued by DHS describe the procedures to be followed in adjudicating DACA requests and terminating DACA status. See National Standard Operating Procedures (SOP), Deferred Action for Childhood Arrivals (DACA), Version dated Apr. 4, 2013 [Doc. 14-17] ("April 4 SOP"), and Version dated Aug. 25, 2013 [Docs. 18-2 & 24-1] ("August 28 SOP").[2] The SOP states that it is applicable to all personnel performing adjudicative functions and the procedures to be followed are not discretionary. April 4 SOP at 16; Tr. of Mot. for Prelim. Inj. Hr'g [Doc. 27] at 29 (including the confirmation from counsel for Defendants that "[t]hey are the guidelines that adjudicators are to apply.").

---

[2] In their response to Plaintiff's motion, Defendants attached a revised portion of Chapter 14 of the SOP dated August 28, 2013, as well as an Appendix to the SOP dated December 29, 2015. [Doc. 18-2 at 59-70.] At the June 8, 2017, hearing on Plaintiff's motion, the Court provided Defendants until the end of that day to provide a more complete version of the SOP, which was filed provisionally under seal based upon Defendants' contention that they had insufficient time to redact those portions of the SOP that may reveal privileged or sensitive law enforcement information. See Defs.' Mot. to File Supp. Exs. Under Seal [Doc. 25]. The Court will rule on Defendants' motion to seal by a separate order. Nevertheless, citations to the April 4 SOP reflect that there has been no change to the cited provisions in the August 28 SOP.

## 1. The SOP Requirements Relating to DACA Applications

Chapter 8 of the SOP, entitled "adjudication of the DACA Request," indicates that

> Officers will NOT deny a DACA request solely because the DACA requestor failed to submit sufficient evidence with the request (unless there is sufficient evidence in our records to support a denial). As a matter of policy, officers will issue an RFE [Request for Evidence] or a Notice of Intent to Deny (NOID).
>
> If additional evidence is needed, issue an RFE whenever possible.
>
> When an RFE is issued, the response time given shall be 87 days.
>
> \*\*\*
> When a NOID is issued, the response time given shall be 33 days.

April 4 SOP at 45. The SOP also states that: "In general, the officer shall issue a denial whenever the requestor's response to a Request for Evidence (RFE) or Notice of Intent to Deny (NOID) is insufficient to establish eligibility. There may be exceptions when a NOID or second RFE is appropriate after an initial RFE." Id. at 105.

To clarify these directives, DHS issued an internal question and answer section specifically pertaining to DACA applications:

> Question: Should centers deny a DACA request without first issuing an RFE or NOID?
>
> Answer: In general, SCOPS [Service Center Operations] requires the Centers to issue either an RFE or NOID before

11

denying a DACA request. An RFE is appropriate when the record lacks sufficient evidence to demonstrate that the requestor satisfies one or more of the guidelines, and a NOID is appropriate when the record contains evidence that the requestor clearly does not satisfy one or more of the guidelines (e.g., disqualifying action/event).

However, the Centers may deny a DACA request without first issuing an RFE or NOID when the record contains irrefutable evidence that the requestor:

- Is deceased.
- Was in immigration detention at the time of filing, remains in immigration detention as of the date the I-821D is adjudicated, and
  - ICE indicates that it does not intend to physically release the requestor within 30 days; or
  - ICE confirms the individual is an enforcement priority.
- At the time of filing, was under age 15 and was not in removal proceedings, did not have a final removal order, or did not have a voluntary departure order.
- Did not arrive in the United States before reaching his/her 16th birthday.
- Was age 31 or older on 6/15/2012.
- Was convicted of a felony that poses a threat to public safety, as described on pages 3 & 4 of the 11/7/2011 NTA Memorandum.
- Already received deferred action as a childhood arrival from USCIS or ICE.
- Acquired lawful immigration status after 6/15/2012 and is in a lawful immigration status as of the date the I-821D is adjudicated.
- Was a lawful permanent resident on 6/15/2012.

- Was under an order of voluntary departure or deportation, exclusion, or removal **and** was physically removed by ICE **or** voluntarily departed the U.S. while their form I-821D was pending with USCIS **and such departure was witnessed by a DHS official**.
- USCIS records show that the requestor's previous DACA request (initial or renewal) was terminated on the basis of 1) issuance of an NTA; 2) travel outside of the U.S. without advance parole; 3) being an enforcement priority/public safety concern; or 4) fraud.

When the Centers deny a DACA request without issuing an RFE or NOID, they will include a brief executive summary of the decision in the A-file.

Please see the DACA SOP and Internal FAQs for additional information about handling procedures for these scenarios. If you believe a straight denial is appropriate for a particular case that does not fall within one of the categories identified above, please send a Request for Adjudicative Guidance to the HQSCOPS [Headquarters Service Center Operations] DACA mailbox.

DHS Internal FAQ: NOID vs. Denial updated Sept. 2, 2015 [Doc. 24-1], submitted

as Ex. K to Defs.' Resp. (emphasis in original).[3]

---

[3] DACA SOP Appendix E (NOIDS) contains language to be used in Notice of Intent to Deny letters under different factual circumstances. See DACA SOP, Appendix E [Doc. 24] ("App. E") submitted as Ex. H to Defs.' Resp. For example, the DACA SOP contemplates sending a Notice of Intent to Deny to an applicant who has been convicted of three or more non-significant misdemeanors, id. at 8, and to an applicant who has been convicted of one significant misdemeanor. Id. at

In summary, the SOP provides that, in the usual circumstance, an application for an initial or renewed DACA status should not be denied without the issuance of a Request for Evidence or a Notice of an Intent to Deny, either of which provides time for the applicant to respond prior to final action being taken. There are several listed scenarios under which a DACA application can be denied without first issuing a RFE or NOID, but Defendants have not presented any evidence that any of those listed scenarios applies to Plaintiff. Finally, if the adjudicator believes that a "straight denial" without the opportunity for an applicant to respond is "appropriate," and the situation is not covered by any of the listed scenarios, a "Request for Adjudicative Guidance" must be made; moreover, if a denial of a request is made without providing the applicant with an opportunity to respond, a "brief executive summary" of that decision must be placed in the file.

## 2. The SOP Requirements Relating to DACA Terminations

Chapter 14 of the SOP, entitled "DACA Termination," provides as follows:

> If it comes to the attention of an officer that removal was deferred under DACA in error, the officer should reopen the case on Service motion and issue a Notice of Intent to Terminate, unless there are criminal, national security, or public safety concerns (see below). The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The

10. There is no suggested language concerning an applicant who has been convicted of one non-significant misdemeanor.

Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization granted during the period of deferred action will be terminated for cause.

If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice, prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice.

August 28 SOP at 136. However, if it comes to light that an applicant is granted

DACA status in error due to, among other things, a disqualifying criminal offense,

the SOP provides as follows:

If disqualifying criminal offenses or public safety concerns, which are deemed to be EPS [Egregious Public Safety], arise after removal has been deferred under DACA, the officer should forward the case to the BCU [Background Check Unit] DACA Team who, in turn, will refer the case to ICE and follow the handling procedures outlined in the November 7, 2011 NTA [Notice to Appear] memorandum for EPS cases. If ICE accepts the case, the issuance of the NTA will result in the termination of DACA. Upon the filing of the NTA with EOIR [Executive Office for Immigration Review], the individual's employment authorization terminates automatically.

If ICE does not accept the case or if the disqualifying criminal offense is non-EPS per the November 7, 2011 NTA memorandum, the BCU DACA Team should reopen the case on Service motion and issue a Notice of Intent to Terminate. The individual should be allowed 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. The Notice of Intent to Terminate should include a statement that if deferred action for childhood arrivals is terminated, any associated employment authorization

granted during the period of deferred action will be terminated for cause.

> If the adverse grounds are not overcome, or no response is received to the Notice of Intent to Terminate, the officer should prepare a Termination Notice and seek supervisory review of the draft Termination Notice prior to issuance. The Termination Notice should indicate that the individual's employment authorization is terminated for cause as of the date of the notice. Consequently, the Class of Admission (COA) code in CIS [Central Index System] should be changed to DAT (Deferred Action Terminated) for employment verification purposes. Additionally, the BCU DACA Team should forward the individual's name to ERO [Enforcement and Removal Operations].

Id. at 137.

> In another circumstance,

> If after consulting with ICE, USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA, the officer should refer the case to HQSCOPS [Headquarters Service Center Operations], though the normal chain of command, to determine whether or not a NOIT is appropriate. If it is determined that the case warrants final termination, the officer will issue DACA 603—Termination Notice . . . .

Id. at 138.

In summary, the SOP provides that, in the usual circumstance, a termination of an individual's DACA status will not occur without prior notice to that individual. In the situation where USCIS determines that the continued exercise of prosecutorial discretion after removal has been deferred "is not consistent with

16

[DHS's] enforcement priorities," the matter must be referred to a more senior authority for a determination of whether a notice of intent to termination "is appropriate."

## F. The Preliminary Injunction Hearing

At the hearing on Plaintiff's motion held on June 8, 2017, counsel for Defendants confirmed that Plaintiff has at all relevant times met all five DACA program eligibility criteria delineated in the Napolitano Memo and that there has been no change with respect to those criteria since Plaintiff initially obtained deferral under DACA on July 1, 2013.

> THE COURT: Under the Secretary Napolitano's memo – let me pull that out here – of June 15, 2012, there are five criteria listed that need to be satisfied before an individual is even considered for the exercise of prosecutorial discretion under DACA.
>
> It's true, is it not, that the plaintiff fulfilled those criteria during the period of time that she was granted DACA status and then renewed DACA status the first time, is that correct?
>
> MR. ROBINS: Yes.
>
> THE COURT: All right. Are any of those five criteria, did something occur prior to the current decisions which are before the Court? And that is, not to renew her DACA status in particular, but also to terminate her DACA status where she no longer fulfills one of these – all five of those criteria.
>
> MR. ROBINS: No, I don't believe so, your Honor.

Tr. of Mot. for Prelim. Inj. Hr'g at 30. Counsel for Defendants also admitted that there was no disqualifying criminal offense or egregious public safety concern that arose after Plaintiff's removal was deferred. Id. at 33.

Counsel for Defendants indicated that the only change that has occurred since Plaintiff initially received her DACA status and had that status renewed is the issuance of a Memorandum from the current Secretary of DHS, John Kelly, on February 20, 2017, entitled "Enhancing Public Safety in the Interior of the United States" [Doc. 18-2 at 48-53] ("Kelly Memo"). Tr. of Mot. for Prelim. Inj. Hr'g at 40-41. Although the Kelly Memo purports to rescind and supersede "all existing conflicting directives, memoranda, or field guidance regarding the enforcement of our immigration laws and priorities for removal," it specifically excludes "the June 15, 2012, memorandum entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children,'" *i.e.*, the Napolitano Memo. Kelly Memo at 2.

In addition, DHS has published on its website a series of questions and answers related to how the Kelly Memo will be implemented operationally. See printout of DHS website dated May 18, 2017 [Doc 14-16]. The document poses the question: "Do these memoranda affect recipients of Deferred Action for

Childhood Arrivals (DACA)?" The answer is clear and unambiguous: "No." Id.
at 9.

Counsel for Defendants was unable to provide the Court the actual reason
for the decisions to terminate Plaintiff's DACA status and deny her renewal
application. Tr. of Mot. for Prelim. Inj. Hr'g at 42-45. Counsel for Defendants
confirmed that Plaintiff's pre-trial diversion agreement is not considered to be a
conviction for immigration purposes, but speculated that USCIS may have
considered Plaintiff's misdemeanor conviction of driving without a license (which
Defendants were aware of since 2010) as well as the Kelly Memo (which, as stated
above, specifically excludes the DACA Program). Likewise, Defendants were
unable to confirm that DHS's Standard Operating Procedures under the DACA
program were followed with respect to the review of Plaintiff's renewal application
or the decision to terminate her DACA status. See id. at 33-34, 42-43.

## II.   SUBJECT MATTER JURISDICTION

The first issue which must be determined is whether the Court has
jurisdiction to hear this case. Plaintiff alleges that the Court has jurisdiction
pursuant to: (1) 28 U.S.C. §§ 1331, 1343; (2) 5 U.S.C. § 701 et seq. (the APA);[4]

---

[4] The APA does not provide the Court with an independent basis for subject matter
jurisdiction. See Califano v. Sanders, 430 U.S. 99, 106-07 (1977). If at all, subject
matter jurisdiction is proper under the APA only in combination with the Court's

and (3) authority to grant declaratory relief under 28 U.S.C. §§ 2201, 2202 (the Declaratory Judgment Act). See Am. Compl. ¶ 14. Defendants argue the Immigration and Nationality Act ("INA") explicitly precludes review of (1) the discretionary decision to terminate Plaintiff's DACA status, (2) the effects of that decision on Plaintiff's removal proceeding, and (3) any subsequent decision to take Plaintiff into custody during the pendency of her removal proceeding and any appeals. Defs.' Resp. at 10-16. Specifically, Defendants argue that two provisions within the INA, 8 U.S.C. §§ 1252(g) and 1252(b)(9), strip this Court of subject matter jurisdiction to hear Plaintiff's case. Defendants also contend that the APA does not permit judicial review of cases where agency action is committed to agency discretion by law.

Section 1252(g) provides that "no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." See also Gupta v. McGahey, 709 F.3d 1062, 1066 (11th Cir. 2013) (affirming the district court's dismissal

---

federal question jurisdiction under 28 U.S.C. § 1331. 14A Charles A. Wright, Arthur C. Miller & Edward H. Cooper, Federal Practice and Procedure § 3659, at 51 (3d ed. 1998). The federal question statute confers jurisdiction on the district courts over actions "arising under" federal law. 28 U.S.C. § 1331.

pursuant to § 1252(g) after finding that the plaintiff was challenging "actions taken to commence removal proceedings.").

Section 1252(b)(9) ("Requirements for review of orders of removal") states that, with respect to review of an order of removal under the INA:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact.

8 U.S.C. § 1252(b)(9).

The Court agrees with Defendants that § 1252(g) strips this Court of jurisdiction to review the government's ultimate discretionary determination as to Plaintiff's DACA status. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 485 (1999) ("Section 1252(g) seems clearly designed to give some measure of protection to 'no deferred action' decisions and similar discretionary determinations, providing that if they are reviewable at all, they at least will not be made the bases for separate rounds of judicial intervention outside the streamlined process that Congress has designed."); see also Rodriguez v. Sessions, No. 15-72487, 2017 WL 695192, at *1 (9th Cir. Feb. 22, 2017) ("We lack jurisdiction to

consider [the plaintiff's] eligibility for Deferred Action for Childhood Arrivals.");

Vasquez v. Aviles , 639 F. App'x 898, 901 (3rd Cir. 2016) ("[Section 1252(g)]

deprives all courts of jurisdiction to review a denial of DACA relief because that

decision involves the exercise of prosecutorial discretion not to grant a deferred

action.") (citing Reno, 525 U.S. at 485); Fabian-Lopez v. Holder, 540 F. App'x

760, 761 n.2 (9th Cir. 2013) (determining that Section 1252(g) deprived the court

of jurisdiction to consider the plaintiff's DACA eligibility); Tinoco v. Johnson, No.

C 15-02801 WHA, 2015 WL 4396351, at *1 (N.D. Cal. July 17, 2015) ("Federal

courts, however, lack subject-matter jurisdiction to determine DACA eligibility, as

stated in 8 U.S.C. § 1252(g) . . . ."). However, the Court finds that neither of the

statutes relied upon by Defendants applies to the narrower issue also presented by

this case; specifically, whether Defendants complied with their own procedures to

(1) adjudicate Plaintiff's DACA renewal application, and (2) terminate Plaintiff's

DACA status.

Section 1252(b)(9) relates to the review of orders of removal. Although

Plaintiff is involved in an on-going removal proceeding that ultimately may result

in an order regarding her removal from this country, there has been no such order

issued. Similarly, the Court is not deprived of jurisdiction by § 1252(g) to consider

whether Defendants followed their own procedures in denying Plaintiff's

application for DACA renewal or terminating her DACA status. Section 1252(g)

only strips district courts of jurisdiction to hear cases involving a "decision or

action . . . to commence proceedings, adjudicate cases, or execute removal orders."

As the Supreme Court explained in Reno, § 1252(g) does not apply to the entire

universe of deportation-related claims, but instead

> applies only to three discrete actions that the Attorney General may
> take: her "decision or action" to "*commence* proceedings, *adjudicate*
> cases, or *execute* removal orders." There are of course many other
> decisions or actions that may be part of the deportation process-such
> as the decisions to open an investigation, to surveil the suspected
> violator, to reschedule the deportation hearing, to include various
> provisions in the final order that is the product of the adjudication, and
> to refuse reconsideration of that order.

Reno, 525 U.S. at 482 (emphasis in original); see also Alvarez v. U.S. Immigration

& Customs Enforcement, 818 F.3d 1194, 1202 (11th Cir. 2016) (stating that Reno

"instructs us to narrowly interpret § 1252(g)—a command that our sister circuits

have applied in subsequent cases."). In this case, a removal proceeding was

commenced against Plaintiff in May 2010, but that decision to commence the

proceedings is not presently before the Court. Likewise, there has been no

adjudication in Plaintiff's removal proceeding nor is there any order to be

executed. Accordingly, the Court finds that neither of these statutes divests this

Court of jurisdiction to hear Plaintiff's challenge to the *non-discretionary* process

by which her DACA renewal application was determined and the *non-discretionary* process by which her DACA status was terminated.

Likewise, Defendants' argument that § 701(a) of the APA bars this Court from reviewing an agency's non-discretionary review process fails. The Eleventh Circuit's decision in Perez v. U.S. Bureau of Citizenship & Immigration Servs. (USCIS), 774 F.3d 960 (11th Cir. 2014), illustrates the important distinction between challenges to an agency's ultimate discretionary decision and challenges to non-discretionary administrative determinations. In Perez, the plaintiff challenged a determination regarding his eligibility to apply to adjust his immigration status. Id. at 963. The court recognized that while the "ultimate decision whether to grant adjustment of status under the [Cuban Adjustment Act] is discretionary[,] . . . USCIS initial statutory-eligibility decisions, which are made before the discretionary decision whether to grant adjustment of status, are purely legal questions that do not implicate agency discretion." Id. at 965 (citing Mejia Rodriguez v. U.S. Dep't of Homeland Sec., 562 F.3d 1137, 1143-44 (11th Cir. 2009) (citation omitted). Put another way, "simply because the Secretary has the ultimate discretionary authority to grant an immigration benefit does not mean that every determination made by USCIS regarding an alien's application for that benefit is discretionary, and hence not subject to review." Mejia Rodriguez, 562

F.3d at 1143. Similarly, in this case, Defendants' failure to follow the procedures detailed in the DACA SOP does not implicate agency discretion. Therefore, the jurisdiction-stripping provisions of 8 U.S.C. §§ 1252(g) and 1252(b)(9) and 5 U.S.C. § 701(a) are not applicable to prevent this Court from determining whether DHS complied with its non-discretionary procedures.

## III.   PRELIMINARY INJUNCTION - STANDARD OF REVIEW[5]

To obtain a preliminary injunction, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the injunction is not granted; (3) that the threatened injury to movant absent an injunction outweighs the harm to Defendants if an injunction is granted; and (4) that granting the injunction would not disserve the public interest. Scott v. Roberts, 612 F.3d 1279, 1290 (11th Cir. 2010); Project Vote, Inc. v. Kemp, 208 F. Supp. 3d 1320, 1348 (N.D. Ga. 2016). "The likelihood of success on the merits is generally considered the most important of the four factors." Furman v. Cenlar FSB, No. 1:14-CV-3253-AT, 2015 WL 11622463, at *1 (N.D. Ga. Aug. 26, 2015) (citation and quotation omitted); see also Garcia-Mir v. Meese, 781 F.2d 1450,

---

[5] This Court conducted a hearing on Plaintiff's motion on June 8, 2017, after notice to all parties and an opportunity for both sides to submit briefs. Accordingly, as both parties had notice of the motion and appeared at the hearing, this Court considers Plaintiff's motion as a motion for preliminary injunction. See FED. R. CIV. P. 65(a).

1453 (11th Cir. 1986) ("Ordinarily the first factor is the most important."). A preliminary injunction is "an extraordinary and drastic remedy" and should be granted only when the movant clearly carries the burden of persuasion as to each of the four prerequisites. Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A., 320 F.3d 1205, 1210 (11th Cir. 2003). The purpose of a preliminary injunction is to maintain the status quo until the court can enter a final decision on the merits of the case. Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011).

## IV. ANALYSIS

### A. Substantial Likelihood of Success

Count I of Plaintiff's Amended Complaint seeks relief pursuant to § 706(2)(A) of the APA based on Defendants' decisions to deny her renewal application and terminate her DACA status, both of which Plaintiff alleges were made in a manner that was not consistent with Defendants' non-discretionary procedures. Plaintiff argues that she is likely to succeed on the merits of this claim because these decisions violated DHS's own procedures and were, therefore, arbitrary, capricious, and contrary to law. Am. Compl. ¶¶ 74-77. The Court agrees.

> The APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA further states "[a]gency action

26

made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." Id. § 704. An agency action is final when two conditions are met: (1) "the action must mark the consummation of the agency's decision-making process [ ]—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Mejia Rodriguez, 562 F.3d at 1145 (citation and internal quotation marks omitted). A reviewing judge shall "compel agency action unlawfully withheld or unreasonably delayed" and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

Perez, 774 F.3d at 965.

As explained above, the DACA SOP specifically details three procedures by which a person's DACA status can be terminated. Although Defendants were unable to inform the Court which process was followed in this case, if any, the record before the Court reveals that their efforts fell short under any of the three scenarios. Under the first scenario, the government would issue a Notice of Intent to Terminate ("NOIT"), which would in turn grant the applicant/recipient thirty-three days to contest the grounds cited in the Notice. Plaintiff was given no such notice or opportunity to contest the decision in this case.

Under the second scenario, the DACA SOP provides that DACA status can be terminated upon the discovery that it was granted in error due to a disqualifying criminal offense which is deemed to present an "Egregious Public Safety" concern.

August 28 SOP at 137. Defendants, however, have foreclosed this as a viable option in this case by admitting that Plaintiff's pre-trial diversion agreement in this case was not a "conviction" that would render her ineligible for DACA treatment, see Defs.' Resp. at 17 n.10, and admitted in open Court that this matter did not involve an "Egregious Public Safety" concern.

The third scenario provides that DACA status can be terminated without notice

> [i]f after consulting with ICE, USCIS determines that exercising prosecutorial discretion after removal has been deferred under DACA is not consistent with the Department of Homeland Security's enforcement priorities, and ICE does not plan to issue an NTA [notice to Appear], the officer should refer the case to HQSCOPS [Headquarters Service Center Operations], though the normal chain of command, to determine whether or not a NOIT [Notice of Termination] is appropriate.

August 28 SOP at 138. However, there is no indication in the record before the Court that this process of referring the case to multiple entities for various determinations prior to termination—which it appears may allow termination of Plaintiff's DACA status without notice—was followed by Defendants.

Defendants apparently also failed to follow the DACA SOP in their adjudication of Plaintiff's renewal application. The DACA SOP regarding DACA applications requires that a DACA applicant be provided a notice of intent to deny the application, or a request from the government for more evidence from the

28

applicant, along with an opportunity for the applicant to respond, before a denial of the application is issued. See April 4 SOP at 3, 8. Appendix E to the DACA SOP even includes Notice of Intent to Deny form letters to be sent to applicants who, for example, are convicted of three misdemeanors or of one significant misdemeanor. App. E at 8, 10. At most, the record reveals that Plaintiff's only relevant criminal offense was her misdemeanor conviction of driving without a license. However, no notice of intent to deny her application was issued to Plaintiff in this case and she was not afforded an opportunity to respond to the decision to deny her renewal application.

It is also evident that nothing in the record before the Court indicates that there is irrefutable evidence that Plaintiff falls under one of the enumerated criteria that would permit USCIS to deny her request for renewal of her DACA status without notice. In addition, the record lacks any evidence that a request for adjudicative guidance was made to justify a "straight denial" of a request to renew under DACA when there was no record evidence to support such a denial.

Defendants place great reliance upon the Kelly Memo in an effort to justify their determinations with respect to Plaintiff's DACA status. However, the Kelly Memo, by its own terms, has no application to the DACA program.

Because Defendants have failed to present any evidence that they complied with their own administrative processes and procedures with regard to the termination of Plaintiff's DACA status and the denial of her renewal application, Plaintiff has shown that she is likely to prevail on her claim that Defendants violated the APA.[6] Plaintiff is entitled to at least the process afforded in Defendants' own procedures with regard to the termination of her DACA status as well as the adjudication of her renewal application.

**B. Irreparable Injury in the Absence of an Injunction**

If an injunction is not entered to prevent Plaintiff's DACA status from being terminated or not renewed because of Defendants' failure to follow its own procedures, Plaintiff will suffer irreparable harm. Prior to Defendants' actions, Plaintiff's DACA status meant that it was unlikely that she would be removed from the United States. Now that her DACA status has been unlawfully terminated, she faces the real potential of removal, particularly because Defendants have seen fit to deny her that status without offering evidence that the denial was made in

---

[6] Because the Court concludes that Plaintiff is likely to succeed on the merits of her First Claim of Relief in her Amended Complaint, which alleges that Defendants' actions were arbitrary and capricious in violation of the APA by failing to renew and terminating her DACA status in contravention of DHS's own procedures, it is unnecessary to consider Plaintiff's second and third claims for relief in conjunction with her motion for preliminary injunction.

accordance with their own procedures. In addition, Plaintiff's emotional distress caused by this insecurity is another factor in determining that Plaintiff will suffer irreparable injury without the entry of a preliminary injunction which compels Defendants to comply with DHS's SOP prior to denying Plaintiff her application to renew her DACA status or terminating that status.

## C. The Threatened Injury to Plaintiff Outweighs Any Harm to Defendants and Does Not Disserve the Public Interest.

The Court finds that the harm to Plaintiff in the absence of an injunction will exceed any harm suffered by Defendants because of the grant of a preliminary injunction. By granting an injunction until the merits of the underlying dispute are adjudicated, the Court is simply requiring Defendants to comply with DHS's written procedures as to the adjudication of DACA applications and the termination of DACA status. There can be no harm to Defendants in requiring them to follow their own written guidelines, but the harm to Plaintiff by Defendants' failure to do so is significant.[7] Furthermore, because the public has an

---

[7] Defendants argue that their interest in enforcing immigration laws outweighs any harms alleged by Plaintiff. Defendants' interest in enforcing immigration laws does not justify them running roughshod over Plaintiff by ignoring their own required procedures prior to undertaking action to deny or terminate her DACA status. Defendants admit that Plaintiff's pre-trial diversion proceeding does not constitute a criminal conviction under immigration law, there is nothing in Plaintiff's history that classifies her as an egregious public safety risk, and there has been no change in circumstances since the last time Plaintiff's DACA status

31

interest in government agencies being required to comply with their own written guidelines instead of engaging in arbitrary decision making, Plaintiff has made the requisite showing that the public interest would be served by this Court's entry of a preliminary injunction enjoining Defendants from failing to comply with their written operating procedures.

## V.   CONCLUSION

For the foregoing reasons, Plaintiff's Emergency Motion For a Temporary Restraining Order and/or for a Preliminary Injunction [Doc. 14] is **GRANTED IN PART** as follows.

It is hereby **ORDERED** that USCIS's decision to terminate Plaintiff's status under the Deferred Action for Childhood Arrivals program memorialized in the May 3, 2017, Termination Notice is preliminarily enjoined. This preliminary injunction also applies to enjoin Defendants' termination of Plaintiff's employment authorization, which was included as a portion of the May 3, 2017, Termination Notice.

---

was renewed. Defendants' attempt to rely on the Kelly Memo to justify their decisions reinforces the arbitrariness of their actions against Plaintiff, when the Kelly Memo expressly exempts the DACA program from its scope. Defendants have presented no evidence to this Court which justifies the failure to follow their own procedural guidelines prior to denying Plaintiff's application for renewal of her DACA status and terminating that status.

It is further **ORDERED** that USCIS's decision to deny Plaintiff's renewal application for DACA status memorialized in the May 8, 2017, Decision is preliminarily enjoined.

It is further **ORDERED** that Defendants shall reconsider the termination of Plaintiff's DACA status and re-adjudicate Plaintiff's renewal application in a manner consistent with the Department of Homeland Security's Standard Operating Procedures and this Order.

It is further **ORDERED** that Plaintiff's DACA status, including her employment authorization, is reinstated pending Defendants' re-adjudication of Plaintiff's renewal application and reconsideration of the termination of Plaintiff's DACA status. This Order shall remain effective until further Order from this Court, which will issue only after Defendants have submitted sufficient proof that they have followed all relevant standard operating procedures regarding the adjudication of Plaintiff's renewal application and any termination of Plaintiff's DACA status.

**IT IS SO ORDERED** this 12th day of June, 2017.

*Mark H. Cohen*
MARK H. COHEN
United States District Judge