# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **JESSICA M. COLOTL COYOTL,** | ) | **Case No. 1:17-cv-1670-MHC** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ELAINE C. DUKE, Secretary,** | ) | |
| **Department of Homeland Security; L.** | ) | |
| **FRANCIS CISSNA, Director, U.S.** | ) | |
| **Citizenship and Immigration Services;** | ) | |
| **MARK J. HAZUDA, Director, Nebraska** | ) | |
| **Service Center, U.S. Citizenship and** | ) | |
| **Immigration Services; THOMAS D.** | ) | |
| **HOMAN, Acting Director, U.S.** | ) | |
| **Immigration and Customs Enforcement;** | ) | |
| **SEAN W. GALLAGHER, Atlanta Field** | ) | |
| **Office Director, U.S. Immigration and** | ) | |
| **Customs Enforcement.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      Plaintiff Jessica Mayeli Colotl Coyotl ("Plaintiff" or "Ms. Colotl"), originally from Mexico, is a resident of Georgia who was first brought to this country as a child nearly eighteen years ago. For seven years, federal immigration authorities repeatedly granted her permission to live and work in this country, most recently pursuant to the Deferred Action for Childhood Arrivals ("DACA") program. However, in May 2017, Defendants unlawfully stripped Ms. Colotl of her DACA and employment authorization and denied her renewal request without notice, without process, and without a reasoned explanation for their actions.

2.      In response, Ms. Colotl filed a complaint and amended complaint in this Court challenging Defendants' DACA determination. Ms. Colotl moved for a preliminary injunction, seeking to enjoin Defendants' revocation of her DACA and denial of her renewal request. This Court granted Ms. Colotl's motion on June 12, 2017, and issued an order temporarily reinstating Ms. Colotl's DACA and work authorization. The Court ordered Defendants to comply with the DACA rules prior to any termination, as well as to re-adjudicate Ms. Colotl's DACA renewal application in accordance with those rules and the Court's order. Defendants, however, have failed to comply with this Court's order. They have once again failed to follow their own procedures and have arbitrarily and capriciously denied Ms. Colotl's re-opened DACA application. Defendants have based their decision

1

on the fact that Ms. Colotl is in removal proceedings, even though that was the case when Ms. Colotl was granted DACA twice before and even though the DACA rules expressly provide that a noncitizen who is in removal proceedings or subject to a final order of removal remains eligible to apply for and receive DACA like any other applicant.

3.      Ms. Colotl is an extraordinary young woman who has worked hard to pursue an education and has made substantial contributions to her community. She graduated with honors from Lakeside High School in DeKalb County, Georgia, and earned a Bachelor's degree from Kennesaw State University in Kennesaw, Georgia, where she was named to the President's List based on her academic performance, and was a founding member of her college's chapter of the Lambda Theta Alpha Sorority. Since graduating from college in 2011, she has worked as a paralegal and dreams of going to law school and becoming a lawyer. Ms. Colotl is widely recognized as an outstanding and remarkable young role model who has devoted herself to community service and activism.

4.      Created in June 2012, the DACA program was designed to provide a lifeline to young undocumented immigrants, like Ms. Colotl, who came to the United States as children.

5.      As former President of the United States Barack Obama explained when the DACA program was first announced, these young immigrants "are Americans

in their heart, in their minds, in every single way but one: on paper."[1] He recognized that "it makes no sense" to deport "[t]hese [] young people who study in our schools , . . . play in our neighborhoods, [are] friends with our kids, [and] pledge allegiance to our flag."[2]

6.      Recognizing that the government must prioritize its limited law enforcement resources, the Department of Homeland Security ("DHS") created the DACA program to allow young undocumented immigrants who satisfy certain age, educational, and other requirements to remain in the United States without fear of deportation for a specified, renewable two-year period, and thus continue to contribute to their communities.

7.      Like all DACA recipients, Ms. Colotl passed a criminal background check and was found—in her case twice—to have satisfied each of the applicable eligibility criteria for DACA: in 2013, when she initially applied, and again in 2015, when DHS granted her first renewal request.

8.      Because of the DACA program, Ms. Colotl and hundreds of thousands of young immigrants like her have been able to complete their educations, begin careers, and live meaningful and productive lives in the United States.

---

[1]      President Barack Obama, Remarks on Immigration Reform, 2012 DAILY COMP. PRES. DOC. 1 (June 15, 2012), *available at* http://www.gpo.gov/fdsys/pkg/DCPD-201200483/pdf/DCPD-201200483.pdf.

[2]      *Id.*

9.     Despite the fact that Ms. Colotl's circumstances had not changed during the four years she was a DACA recipient, DHS suddenly terminated Ms. Colotl's DACA and denied her application for renewal on the grounds that she did not meet the program's eligibility criteria. DHS' decision was based on its mistaken belief that Ms. Colotl had a disqualifying felony conviction.

10.    However, as DHS admitted during the course of this litigation, Ms. Colotl has no disqualifying felony conviction. She remains eligible for DACA, as she continues to satisfy the program's education and residency requirements and she has no disqualifying criminal history.

11.    When Defendants terminated Ms. Colotl's DACA and denied her renewal request in May 2017, she received no meaningful explanation from DHS as to why it reversed its decision when her circumstances had not changed. Nor did DHS provide Ms. Colotl with any opportunity to contest the government's actions, in violation of its own procedures.

12.    The revocation and nonrenewal of Ms. Colotl's DACA deprived her of her ability to work and the assurance that she would be permitted to remain in the country she knows as her home.

13.    The government's initial decisions to terminate Ms. Colotl's DACA and deny her renewal application, without meaningful explanation or process, and in violation of the program's enumerated eligibility criteria and procedures, violated

4

the Administration Procedure Act ("APA"), 5 U.S.C. §§ 553, 706, *et al*., as well as the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

14.     Defendants' denial of Ms. Colotl's DACA renewal request for a second time, after re-opening it as required by the Court's preliminary injunction order, is also arbitrary and capricious under § 706 of the APA. Defendants have based their decision to deny Ms. Colotl DACA on the fact that she is in ongoing removal proceedings. Defendants' reliance on this fact to bar her from DACA violates DHS' DACA rules, does not to provide a reasoned explanation for the agency's change in position, and reflects the agency's failure to consider the relevant facts and circumstances and exercise individualized discretion.

15.     Ms. Colotl therefore asks that the Court: declare the government's actions unlawful; order that the government re-adjudicate her re-opened application for DACA following Defendants' procedures and exercising individualized discretion based on the relevant factors; and restore her DACA and work authorization pending the outcome of the government's decision.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 over Plaintiff's claims under the U.S. Constitution and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. The Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because Defendants Elaine C. Duke, L. Francis Cissna, Mark J. Hazuda, Thomas D. Homan, and Sean W. Gallagher are Officers of the United States acting in their official capacities, and DHS, U.S. Immigration and Customs Enforcement ("ICE"), and the United States Citizenship and Immigration Services ("USCIS"), are agencies of the United States. Additionally, Plaintiff resides in this judicial district.

## EXHAUSTION

18.     There are no additional administrative remedies available for Plaintiff to exhaust. There is no administrative appeal of USCIS' decision to terminate Plaintiff's DACA and deny her DACA renewal application.

## PARTIES

19.     Ms. Colotl, a resident of Georgia, is a 29-year-old native and citizen of Mexico who has lived in the United States since she was first brought here in 1999, when she was 11 years old. From May 2010 to May 2017—for seven years— federal immigration authorities authorized her to live and work in the United States in the form of deferred action.

20.     Defendant Elaine C. Duke is sued in her official capacity as Acting Secretary of DHS. As DHS Secretary, Ms. Duke is responsible for the administration and enforcement of the immigration laws of the United States.

21.     Defendant L. Francis Cissna is sued in his official capacity as Director of USCIS. As Director of USCIS, Defendant Cissna is responsible for the overall administration of USCIS and the implementation of the immigration laws of the United States.

22.     Defendant Mark J. Hazuda is sued in his official capacity as Director of the USCIS Nebraska Service Center. As Director of the Nebraska Service Center, Mr. Hazuda is responsible for the overall administration of the USCIS Nebraska Service Center and the decisions that it issues.

23.     Defendant Thomas D. Homan is sued in his official capacity as Acting Director of ICE. In this position, Mr. Homan is responsible for the overall administration of ICE and operation of ICE's immigration enforcement and detention activities.

24.     Defendant Sean W. Gallagher is sued in his official capacity as Director of the ICE Field Office in Atlanta, Georgia. As Field Office Director, Mr. Gallagher is responsible for the administration of the Atlanta Field Office and operation of the office's immigration enforcement and detention activities.

## BACKGROUND

**Deferred Action and the DACA Program**

25.     Deferred action is a longstanding form of administrative action by which the federal Executive Branch decides, for humanitarian or other reasons, to refrain

7

from seeking a noncitizen's removal and to authorize her continued presence in the United States. A grant of deferred action indicates that the noncitizen's presence in the United States is known to the federal government, and that the federal government has made a determination, based on a review of the individual's case, to allow her to remain in the United States for a specified period. Recipients of deferred action are also eligible to receive employment authorization under federal law upon a showing of economic necessity. *See* 8 C.F.R. § 274a.12(c)(14). For decades, the federal government has used deferred action to authorize numerous groups of immigrants to live and work in the United States for a temporary period.

26.     On June 15, 2012, the former DHS Secretary announced a new deferred action program—the DACA program—for young immigrants who came to the United States as children and are present in the country without a formal immigration status. The DACA program was established to allow these young immigrants to remain in the United States without fear of deportation for a specified, renewable period.

27.     In announcing the DACA program, the DHS Secretary explained that "[o]ur Nation's immigration laws . . . are not designed to be blindly enforced without consideration given to the individual circumstances of each case. Nor are they designed to remove productive young people to countries where they may not

8

have lived or even speak the language. Indeed, many of these young people have already contributed to our country in significant ways."[3]

28.     President Obama elaborated that the federal government decided to make deferred action available to young immigrants because "it makes no sense . . . to expel these young people who want to staff our labs or start new businesses or defend our country."[4] These individuals are "talented young people, who, for all intents and purposes, are Americans—they've been raised as Americans, understand themselves to be part of this country." The DACA program is intended "to lift the shadow of deportation from these young people" and "to mend our Nation's immigration policy to make it more fair, more efficient, and more just."[5]

29.     Under DACA, young immigrants who entered the United States as children and who meet educational and residency requirements may apply for deferred action. The DHS Secretary's guidance provides that noncitizens are eligible for DACA if they:

- were under the age of 31 as of June 15, 2012;

---

[3]     Memorandum from Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children ("Napolitano Memo") 2 (June 15, 2012), *available at* http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf.

[4]     President Barack Obama, Remarks on Immigration Reform, 2012 DAILY COMP. PRES. DOC. 1 (June 15, 2012), *available at* http://www.gpo.gov/fdsys/pkg/DCPD-201200483/pdf/DCPD-201200483.pdf.

[5]     *Id.*

- came to the United States before reaching their 16th birthday;

- have continuously resided in the United States since June 15, 2007, up to the present time;

- were physically present in the United States on June 15, 2012, and at the time of making the request for consideration of deferred action with USCIS;

- entered without inspection before June 15, 2012, or had an expired lawful immigration status as of June 15, 2012;

- are currently in school, have graduated or obtained a certificate of completion from high school, have obtained a GED certificate, or are an honorably discharged veteran of the Coast Guard or Armed Forces of the United States;

- have not been convicted of a felony, significant misdemeanor,[6] or three or more other misdemeanors; and,

- do not otherwise pose a threat to national security or public safety.[7]

---

[6]     A significant misdemeanor is a conviction that meets the following criteria: an offense of "domestic violence; sexual abuse or exploitation; burglary; unlawful possession or use of a firearm; drug distribution or trafficking; or, driving under the influence; or . . . [a conviction] for which the individual was sentenced to time in custody of more than 90 days." *See* USCIS, Consideration of Deferred Action for Childhood Arrivals Process, Frequently Asked Questions (May 14, 2017), *available at* https://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions.

30.     If a DACA applicant satisfies these eligibility criteria, the agency may grant him or her deferred action on a case-by-case basis. The eligibility criteria themselves are not discretionary.

31.     The DACA application process includes extensive criminal background checks.

32.     Under the DACA program, deferred action is available for a period of two years, subject to renewal, and applicants who are approved may obtain work authorization, and if such authorization is granted, a Social Security Number.[8] Noncitizens granted work authorization are issued federal employment authorization documents or EADs.

33.     On February 20, 2017, then-DHS Secretary John Kelly issued a memorandum setting forth enforcement priorities that DHS would follow in its enforcement of the immigration laws.[9] Although that memorandum rescinded other existing guidance concerning immigration enforcement priorities, the

---

[7]     Napolitano Memo at 2; USCIS, Consideration of Deferred Action for Childhood Arrivals Process, *supra* note 6.

[8]     *See id.*

[9]     *See* Memorandum from John Kelly, Enforcement of the Immigration Laws to Serve the National Interest 2 (Feb. 20, 2017) (hereinafter the "Kelly Memo"), *available at* https://www.dhs.gov/sites/default/files/publications/17_0220_S1_Enforcement-of-the-Immigration-Laws-to-Serve-the-National-Interest.pdf.

memorandum expressly kept the DACA guidance in place.[10] DHS also issued a

"Q&A" document concerning this memorandum which states (at Question 22):

> Q22: Do these memoranda affect recipients of Deferred Action for
>
> Childhood Arrivals (DACA)?
>
> A22: No.[11]

**The DACA Rules Expressly Provide That a Noncitizen's Placement in Removal Proceedings Does Not Bar a DACA Grant**

34.   USCIS is the division of DHS responsible for evaluating requests for

DACA. DHS' DACA Standard Operating Procedures ("DACA SOPs") set forth

the procedures that the agency must follow in adjudicating and granting DACA

applications, as well as in terminating DACA and EADs granted through the

program.

35.   USCIS' decision to grant or deny a deferred action application or renewal

is separate and independent from any removal proceedings in immigration court to

determine whether a noncitizen should be deported from the United States. The

DACA rules provide that a noncitizen who is in removal proceedings can apply to

---

[10]   *See id.*

[11]   *See* Q&A: DHS Implementation of the Executive Order on Enhancing Public Safety in the Interior of the United States, Feb. 21, 2017, https://www.dhs.gov/news/2017/02/21/qa-dhs-implementation-executive-order-enhancing-public-safety-interior-united-states.

USCIS for DACA separately and simultaneously.[12]  If that application is granted, the removal proceedings nevertheless continue unless the immigration judge takes action to administratively close or terminate the proceedings. Even individuals with final orders of removal can be granted DACA under the program rules. Further, an immigration judge has no power to grant or deny deferred action, or to review or reverse USCIS' decision to deny deferred action.

36.    Specifically, the DACA program rules make clear that noncitizens who are, have been, or will be placed in removal proceedings continue to be eligible for DACA. The DACA Memo itself requires that the eligibility "criteria are to be considered whether or not an individual is already in removal proceedings or subject to a final order of removal."[13] Implementing this command, the DACA procedures provide that "[i]ndividuals in removal proceedings may file a DACA request."[14] Indeed, even individuals with final removal orders can be granted DACA. *See, e.g.*, *id.* at 74 (providing that individuals with final removal orders may be considered for DACA); *id.* at 75 (providing that an individual who has been removed after issuance of a final removal order, re-entered, and is subject to

---

[12]    Napolitano Memo at 2.

[13]    *Id.*

[14]    U.S. Department of Homeland Security, National Standard Operating Procedures, Deferred Action for Childhood Arrivals,Version 2.0 dated April 4, 2013 (hereinafter "DACA SOPs") at 71, https://cliniclegal.org/sites/default/files/attachments/daca_sop_4-4-13.pdf.

reinstatement of that removal order continues to be eligible for DACA). Further, the DACA SOPs provide that even if an NTA is issued against a DACA applicant while his application is pending, USCIS should "proceed with adjudication . . . , taking into account the basis for the NTA." *See* Revised Guidance for the Referral of Cases and Issuance of Notices to Appear (NTAs) in Cases Involving Inadmissible and Removable Aliens (Nov. 7, 2011), at 4 ( "ICE's issuance of an NTA allows USCIS to proceed with adjudication . . . , taking into account the basis for the NTA"); DACA SOPs at 93 (providing that if ICE accepts a case referred to it by USCIS during the DACA application process, then USCIS "will follow the standard protocols outlined in the November 7, 2011 NTA memorandum").

37.   In such cases, USCIS is required to review all relevant circumstances, and may grant the DACA request "[i]f a DACA requestor has been placed in proceedings on a ground that does not adversely impact the exercise of prosecutorial discretion." DACA SOPs at 75. *See also id.* at 74 (providing that for DACA applicants with final removal orders, "[f]inal removal orders . . . should be reviewed carefully to examine the underlying grounds for removal").

**President Trump's Continuation and Then Rescission of the DACA Program**

38.   After President Trump took office, his Administration continued the DACA program for more than seven months. From January to September 2017,

14

USCIS continued to process and grant more than 250,000 initial and renewal DACA applications.

39.   Notwithstanding the success of the DACA program and the public's overwhelming support for it, DHS announced on September 5, 2017, that it was rescinding the DACA program and winding it down.[15] Although the program is soon ending, DHS officials have confirmed that the same program rules continue to apply until it ends.[16]

40.   The agency's guidance provides that DACA recipients will maintain their deferred action grants and work permits until they expire. DHS will not consider new applications for DACA dated after September 5, 2017. In addition, certain

---

[15]   Memorandum from Acting Secretary Elaine C. Duke, Rescission of the June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

[16]   *See Press Briefing by Press Secretary Sarah Sanders and Homeland Security Advisor Tom Bossert, 9/8/2017, #11*, The White House, Office of the Press Secretary (explaining that "[d]uring this six-month time, there are no changes that are being made to the program at this point"), https://www.whitehouse.gov/the-press-office/2017/09/08/press-briefing-press-secretary-sarah-sanders-and-homeland-security; *see also* Testimony of Michael Dougherty, Assistant Secretary of DHS, Committee of the Judiciary, Oversight of the Administration's Decision to End Deferred Action for Childhood Arrivals, Oct. 3, 2017 at 56:54 (stating, in response to Senator Feinstein's question about the status of DACA recipients during the phasing out of the program, that "We rely on guidance that was put in place in 2012 when the DACA program was instantiated. That's available on US-CIS's Web site and will tell you what the priorities are for Immigration Customs enforcement and what they are for the Department at large. Those priorities have not changed"), https://www.c-span.org/video/?435059-1/trump-administration-officials-testify-decision-rescind-daca.

individuals are eligible for two-year renewals. Individuals with a DACA grant

expiring between September 5, 2017, and March 5, 2018, can apply for a two-year

renewal if the application is received by October 5, 2017. Individuals whose

DACA expires on or after March 6, 2018 will not have an opportunity to renew.[17]

**Ms. Colotl's Life in the United States**

41.     Jessica Colotl was born in Mexico and entered the United States without

inspection in September 1999, when she was 11 years old. She has lived in the

United States continuously since her arrival—indeed, this country is the only place

she can call home.

42.     Ms. Colotl attended public school in Georgia. She graduated from

Lakeside High School in DeKalb County, Georgia, in May 2006 with a 3.7 GPA,

having taken several advanced placement classes.

43.     That fall, she enrolled in Kennesaw State University ("KSU"), majoring

first in pre-med and eventually in political science. While at KSU, Ms. Colotl was

named to the President's List based on her academic performance. She was also

actively involved in various student organizations, such as the Hispanic

Scholarship Fund and the Mexican American Student Alliance. She was a

---

[17]     *See* Memorandum from Acting Secretary Elaine C. Duke, Rescission of the
June 15, 2012 Memorandum Entitled "Exercising Prosecutorial Discretion with
Respect to Individuals Who Came to the United States as Children" (Sept. 5,
2017),

https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca.

founding member of the campus' Epsilon Chapter of Lambda Theta Alpha sorority, an organization dedicated to the needs of Latinas and women. The sorority aims to develop strong women leaders, promote unity through charitable and educational programs, and engage in political, social, and cultural activities.

44.     Ms. Colotl's college professors have described her as an "outstanding" and "exemplary" person of "unblemished integrity." They have commended her for displaying "determination," "grace," and "focus" in difficult circumstances. Ms. Colotl's professors and sorority sisters have also recognized her for "contribut[ing] positively to" and "making [her] community a better place."

45.     Ms. Colotl graduated from KSU in May 2011 with a Bachelor's degree in political science, with a legal studies concentration, and a minor in French.

46.     Since graduating, she has worked as an administrative assistant, receptionist, legal assistant, and ultimately paralegal at Kuck Immigration Partners LLC. She aspires to attend law school and become an immigration lawyer.

47.     Ms. Colotl also has continued to devote her time to community service. She volunteers for the Annual Latino Youth Leadership Conference, a yearly conference hosted by the Latin American Association that aims to motivate Latino youth to finish high school and go on to college. The director of that program has described Ms. Colotl as a "remarkable person" who is "honest, dependable," and a "powerful role model" to students. For several years, Ms. Colotl has regularly

17

donated blood platelets at the Northside Hospital in Atlanta, Georgia. She is also a member of Saint Patrick's Catholic Church in Norcross, Georgia.

48.     Ms. Colotl remains active in her sorority. She has raised funds for St. Jude Children's Hospital—her sorority's national philanthropic project—through the annual Saint Jude Walk. From 2015 to 2016, she served as her sorority's Area Finance Coordinator, overseeing the funds for chapters at five separate universities in Georgia, as well as her sorority's alumnae chapter. Ms. Colotl also helps mentor new sorority sisters.

49.     For the past several years, Ms. Colotl has been a passionate advocate for immigration reform. For example, this past April, Ms. Colotl travelled to Washington D.C. to lobby her members of Congress for immigration reform. She has been a frequent speaker at campus and community events on her experiences with the immigration system and on immigrants' rights issues. Currently Ms. Colotl is taking a class with the Georgia Association for Latino Elected Officials to develop her leadership skills and promote civil engagement within the Latino and other under-represented communities.

**Ms. Colotl's Arrest in 2010 and Participation in a Pretrial Diversion Program**

50.     On March 29, 2010, while a senior in college months away from graduation, Ms. Colotl was pulled over by campus police for allegedly blocking

traffic while waiting for a parking space. She was unable to produce a driver's license.[18]

51.    The next day, she was arrested on the charges of impeding the flow of traffic and driving without a license, and booked into the Cobb County jail. After a trial, a jury found her not guilty of impeding the flow of traffic, but guilty of driving without a license, a misdemeanor. She served a total of three days in jail.

52.    Subsequently the Cobb County Sherriff additionally charged Ms. Colotl with allegedly making a false statement when she was booked into the county jail on the traffic violation charges. The felony charge stated that Ms. Colotl provided a false address during booking.

53.    However, Ms. Colotl never made any false statement during the booking process. When she was being booked, a Cobb County Sheriff's Department officer recorded address information contained on a vehicle insurance card that the officer took from Ms. Colotl's purse. The officer never asked Ms. Colotl to provide any address information, and she never made any statement to the officer regarding her address.

---

[18]    Ms. Colotl was not eligible to obtain a driver's license at that time in Georgia due to her lack of a formal immigration status. However, routine activities such as attending school and church were effectively impossible without the ability to drive in Georgia, given the limited public transportation infrastructure.

54.     The address the officer recorded was, in fact, her permanent home address while she attended school. However, Ms. Colotl's parents subsequently moved from the address in April 2010.

55.     In February 2011, Ms. Colotl was indicted on the false information charge. Ms. Colotl entered a plea of not guilty. The District Attorney then exercised his discretion to offer Ms. Colotl the option of entering into his office's pretrial diversion program as an alternative to prosecution, which would result in dismissal of the charge. Although the charge was not justified, Ms. Colotl decided that, rather than undertaking the risk and expense of going to trial again, she would resolve the case by agreeing to perform community service. Ms. Colotl was informed that she would not be required to enter a guilty plea in order to participate. Although a form that Ms. Colotl was required to sign as part of the diversion program contained a boilerplate statement acknowledging that the participant "understand[s] that by [her] participation in the program [she is] admitting guilt," that form was never filed with the court and Ms. Colotl never admitted to any facts that would support any such charge.

56.     Ms. Colotl successfully completed the diversion program, and the false statement charge was dismissed in January 2013. Ms. Colotl was never convicted of the charge and the judge never ordered any punishment or penalty.

57. Ms. Colotl has had no other criminal history or contact with law enforcement.

**Ms. Colotl's Immigration Proceedings**

58. Ms. Colotl's traffic violation arrest in March 2010 also resulted in her being referred to the immigration authorities and placed in removal proceedings.

59. ICE initiated removal proceedings against her on the grounds that she had entered the United States without inspection and was present in the country in violation of law. Ms. Colotl was detained for approximately a month.

60. On April 28, 2010, Ms. Colotl appeared in the Atlanta Immigration Court and accepted an order of voluntary departure, permitting her to leave the United States within 30 days and thereby avoid a final order of removal. *See* 8 U.S.C. § 1229c.

61. As explained below, although Ms. Colotl was granted voluntary departure, Ms. Colotl did not depart the United States because DHS subsequently granted her deferred action status. When she did not depart from the United States within 30 days, her voluntary departure order automatically converted into an order of removal. However, as a result of ICE's initial grant of deferred action in 2010, Ms. Colotl was released from detention in May 2010.

62. In 2014, Ms. Colotl returned to immigration court and filed a motion to reopen her prior removal proceedings to enable her to travel outside of the country

to visit her ailing mother in Mexico. In her motion, Ms. Colotl requested administrative closure of her removal proceedings, which would allow her to leave the country and return without the risk of being barred from reentering the United States.

63.     After the immigration judge denied Ms. Colotl's motion to reopen in January 2015, Ms. Colotl appealed to the Board of Immigration Appeals ("BIA"). On October 6, 2016, the BIA granted Ms. Colotl's appeal, reopened her removal case, and remanded to the immigration judge to grant administrative closure.

64.     However, in July 2017, the immigration judge denied Ms. Colotl's motion to administratively close her proceedings based on the BIA's order. Ms. Colotl filed an interlocutory appeal of that order with the BIA, which remains pending. Ms. Colotl is currently scheduled for her next "master calendar" hearing before the immigration judge on November 7, 2017.

**Ms. Colotl's Grants of Deferred Action from 2010 to 2017**

65.     While her removal proceedings were pending in 2010, members of Ms. Colotl's community, including the President of Kennesaw State University, fellow students, and members of her sorority, rallied around her, urging ICE to allow her to remain in the United States and finish her undergraduate studies. Her case attracted nationwide attention in the media.

66.    On May 5, 2010, ICE granted Ms. Colotl deferred action, permitting her to remain in the United States for one year.

67.    DHS continued to renew Ms. Colotl's deferred action status during the following seven years, including pursuant to the DACA program, and was granted work authorization in relation to each of her grants of deferred action. In total, Defendants determined that Ms. Colotl was eligible for deferred action five separate times over the course of seven years. Each time she applied for deferred action and DACA, Ms. Colotl expressly disclosed to DHS all relevant information regarding the criminal proceedings arising out of her 2010 arrest. And each time, Defendants found Ms. Colotl eligible for deferred action, including issuing her two consecutive DACA grants for a total of four years.

68.    Specifically, after her initial 2010 deferred action grant, ICE renewed Ms. Colotl's deferred action status for additional one-year periods on May 3, 2011, and again on April 30, 2012.

69.    Ms. Colotl then received two consecutive two-year DACA grants on July 1, 2013, and May 19, 2015, until May 18, 2017. Ms. Colotl received and maintained her DACA status despite having a final order of removal.

**Termination of Ms. Colotl's DACA and Denial of Her Renewal Request**

70.    In December 2016, Ms. Colotl submitted her application to renew her DACA to USCIS and, again, included the same relevant information about the

criminal proceedings arising from her 2010 arrest. Because Ms. Colotl's criminal history does not disqualify her from eligibility for DACA, she was eligible for DACA when she applied for renewal in 2016 and remains eligible to this day.

71.    On May 3, 2017, however, USCIS terminated Ms. Colotl's DACA and employment authorization. The termination notice stated—without any further explanation—that "USCIS has determined that exercising prosecutorial discretion in your case is not consistent with the Department of Homeland Security's enforcement priorities." Although DHS failed to provide Ms. Colotl with a meaningful explanation of its termination decision, the agency stated to multiple news outlets that, in its view, she was not eligible for the program due to disqualifying criminal history—specifically, that Ms. Colotl had a felony conviction for immigration purposes. This conclusion, however, was both inconsistent with its prior determinations and factually and legally incorrect.

72.    Further, in terminating Ms. Colotl's DACA, DHS did not comply with its own procedures. Those procedures explicitly provide that if, after DHS grants an individual DACA, it comes to DHS' attention that the grant was in error, the agency should reopen the case, issue a "Notice of Intent to Terminate," and afford the DACA recipient 33 days to file a brief or statement contesting the grounds cited in the Notice of Intent to Terminate. DHS procedures provide that the agency should issue a termination notice only if the adverse grounds are not overcome, or

24

the agency does not receive a response. However, USCIS failed to provide Ms. Colotl with a Notice of Intent to Terminate or an opportunity to present arguments and evidence before issuing the notice of termination.

73.    USCIS also denied Ms. Colotl's pending application to renew her DACA without notice, a reasoned explanation, or an opportunity to respond, apparently based solely on the fact that it had terminated her existing DACA grant.

74.    As a result of USCIS' termination decision, Ms. Colotl was forced to stop working immediately and had to return her work permit to the immigration authorities.

**This Court's Preliminary Injunction Order**

75.    On May 23, 2017, Ms. Colotl filed a motion for a preliminary injunction seeking an order from this Court temporarily enjoining the revocation of her DACA and EAD pending USCIS' re-evaluation of its decision in accordance with the APA and the Due Process Clause of the Fifth Amendment. Doc. No. 14. On June 12, 2017, this Court granted Ms. Colotl's motion for a preliminary injunction (the "preliminary injunction order") and ordered Defendants to reinstate her DACA and EAD pending Defendants' reevaluation of her termination and re-adjudication of her renewal application, in a manner consistent with both the DACA SOPs and with the Court's preliminary injunction order. Doc. No. 28. The Court ordered that its preliminary injunction order would remain in effect until

further order of the Court, which the Court would issue only after Defendants submitted sufficient proof that they followed all relevant SOPs regarding the adjudication of Ms. Colotl's renewal application and any termination of her DACA. *Id*. at 33.

76.    In its preliminary injunction order, the Court observed that Defendants had attempted to rely on the Kelly Memo's enforcement priorities, which prioritize for removal individuals convicted of any crime, to justify revocation of Ms. Colotl's DACA and denial of her renewal application. However, the Court found that the memo, "by its own terms, has no application to the DACA program." *Id*. at 29. The Court also noted that counsel for ICE filed a brief in Ms. Colotl's removal proceedings on March 29, 2017, indicating that the agency opposed administrative closure of her removal proceedings because it had determined that her criminal history made her an enforcement priority under the Kelly Memo. *See id*. at 6.

**This Court's Denial of Defendants' Motion for Reconsideration**

77.    On June 23, 2017, Defendants filed a motion for reconsideration of the portion of the preliminary injunction order finding that the Kelly Memo does not apply to DACA. Specifically, Defendants requested that the Court delete the final sentence on page 29 of the order, which reads, "However, the Kelly Memo, by its own terms, has no application to the DACA program." *Id*. at 29. Defendants also

requested that the Court delete or modify footnote 7 of the order, which states, in relevant part

> Defendants' attempt to rely on the Kelly Memo to justify their decisions reinforces the arbitrariness of their actions against Plaintiff, when the Kelly Memo expressly exempts the DACA program from its scope. Defendants have presented no evidence to this Court which justifies the failure to follow their own procedural guidelines prior to denying Plaintiffs application for renewal of her DACA status and terminating that status.

*Id*. at 31 n.7.

78.   The Court denied Defendants' motion on July 31, 2017, finding that it was not improper for the Court to address the fact that the Kelly Memo, by its own terms, specifically excepts the DACA program from its coverage, particularly because Defendants themselves raised the applicability of the Kelly Memo as a possible basis for their decision not to renew and to terminate Ms. Colotl's DACA. Doc. No. 43.

**Defendants' Notice of Intent to Deny Ms. Colotl's DACA Renewal**

79.   On August 18, 2017, Defendants sent Ms. Colotl a Notice of Intent to Deny ("NOID") her re-opened DACA renewal application. The notice stated in relevant part

> While your re-opened renewal request was pending, U.S. Immigration and Customs Enforcement (ICE) informed USCIS of the following: that ICE opposed your motions to administratively close your case with the Executive Office for Immigration Review; that on July 10, 2017, an Immigration Judge denied your motion to administratively close your proceedings; that ICE is actively seeking a final order of

removal against you in immigration proceedings; and that ICE intends
to remove you if an administratively final order of removal is issued. .
. . Since ICE has informed USCIS that it is actively pursuing your
removal, USCIS will not contemporaneously conclude that removal
action should continue to be deferred in your case.

Doc. No. 50-2 at 2.

80.     The NOID afforded Ms. Colotl 33 days to "submit additional

information, evidence, or arguments for why USCIS should not exercise its

discretion to deny [her] request for the reasons stated" in the NOID.

**Ms. Colotl's Response to Defendants' Notice of Intent to Deny**

81.     On September 15, 2017, Ms. Colotl submitted a response to USCIS'

NOID (attached hereto as Exhibit 1), arguing that the rationale it provided failed to

support a decision to deny her DACA application. Ms. Colotl explained that the

DACA program rules, including the DACA SOPs, do not permit USCIS to deny

Ms. Colotl's DACA renewal application merely on the basis that ICE is pursuing

her removal. Rather, the DACA Memo and SOPs make clear that USCIS is to

adjudicate applications by evaluating the DACA eligibility criteria and exercising

its own, independent discretion based on the totality of the circumstances. These

authorities expressly provide that individuals in removal proceedings or subject to

a final order of removal remain eligible for DACA, and that USCIS has power to

grant their DACA applications regardless of whether ICE is pursuing their

removal. In fact, where an applicant is in removal proceedings, USCIS is required

to independently review the removal grounds in the NTA and surrounding facts in adjudicating the application.

82.    Ms. Colotl also explained that it was particularly inappropriate to rely on ICE's pursuit of removal proceedings where ICE has made clear in its immigration court briefing that it is pursuing Ms. Colotl's removal based on its conclusion that she falls within the enforcement priorities set forth in the Kelly Memo—the very same enforcement priorities that this Court has found did not apply to the DACA program.

83.    Ms. Colotl's submission in response to the NOID also discussed her many personal, academic, and professional accomplishments, and included letters of support from Ms. Colotl's friends, family, colleagues, and former professors attesting to her excellent character and outstanding contributions to her community.

**Defendants' Final Denial of Ms. Colotl's Re-Opened DACA Application**

84.    On October 23, 2017, Defendants issued a final notice of denial of Ms. Colotl's re-opened DACA renewal request. The decision reiterated almost verbatim the same rationale in Ms. Colotl's NOID for denying her renewal application:

> While your re-opened renewal request was pending, U.S. Immigration and Customs Enforcement (ICE) informed USCIS of the following: that ICE opposed your motions to administratively close your case with the Executive Office for Immigration Review; that on July 10,

29

2017, an Immigration Judge denied your motion to administratively close your proceedings; that ICE is actively seeking a final order of removal against you in immigration proceedings; and that ICE intends to remove you if an administratively final order of removal is issued. . . . Since ICE has informed USCIS that it continues to actively pursue your removal, USCIS will not contemporaneously conclude that removal action should continue to be deferred in your case.

Doc. 50-1 at 2.

85.    Notably, Defendants' decision ignores Ms. Colotl's arguments that the DACA program rules do not permit USCIS to deny her DACA renewal application based merely on the fact that ICE is pursuing her removal and that the Kelly Memo provides no basis for denying her renewal application either. Nor does the decision address the evidence Ms. Colotl's submitted demonstrating her tremendous positive equities or her outstanding character and contributions to her community.

86.    Ms. Colotl has suffered and will continue to suffer significant and irreparable harm because of Defendants' decisions, acts, and failures to act as described herein.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Administrative Procedure Act)

87.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

88.    Ms. Colotl satisfies the DACA program's eligibility criteria.

89.     The government's October 23, 2017 decision to deny Ms. Colotl's renewal application on the grounds that ICE is pursuing her removal fails to comply with this Court's order and is arbitrary and capricious and contrary to law for multiple reasons. 5 U.S.C. § 706(2)(A).

90.     First, the government's decision does not comply with this Court's order and is arbitrary and capricious and contrary to law because it violates DHS' own procedures for adjudicating DACA applications. The DACA Memo and DACA SOPs repeatedly make clear that a noncitizen who is in removal proceedings or subject to a final order of removal remains eligible to apply for and receive DACA like any other applicant.

91.     Second, the government has failed to address Ms. Colotl's responses to the reason for denial provided in the NOID. The government has also changed its position on Ms. Colotl's suitability for DACA, where nothing has changed about her circumstances. Indeed, USCIS previously granted Ms. Colotl DACA twice before in 2013 and 2015 when she was not only in removal proceedings, but ICE had *already* pursued removal against her, which resulted in a removal order. Defendants have failed not only to provide a reasoned explanation for this change in position, but have failed even to acknowledge that they are changing position.

92.     Third, Defendants' denial also violates the APA and their own procedures because USCIS did not exercise its discretion at all. Instead of

31

independently exercising its own discretion by considering the eligibility criteria and the "totality of the circumstances" as the DACA procedures require, USCIS denied Ms. Colotl's renewal request based solely on ICE's decision to pursue her removal.

93.     Fourth, Defendants failed to engage in "reasoned decisionmaking" "based on non-arbitrary, 'relevant factors.'" *Judulang v. Holder*, 565 U.S. 42, 55 (2011). Defendants have failed to provide any reasoned basis for their decision. Relying on ICE's decision to pursue removal fails to supply a reasoned basis, particularly because every individual who is eligible for DACA could be the subject of removal proceedings and the DACA rules make clear that the fact of being in removal proceedings itself is not bar to eligibility. Defendants' decision also improperly rests the denial decision on the arbitrary charging decision of an ICE officer.

94.     Moreover, ICE's decision to pursue Ms. Colotl's removal is based on ICE's determination that she is an enforcement priority under the Kelly Memo, which this Court has already found does not alter the DACA eligibility criteria or procedures.

## SECOND CLAIM FOR RELIEF
### (Due Process Clause of the Fifth Amendment to the U.S. Constitution)

95.     The foregoing allegations are repeated and incorporated as though fully set forth herein.

96.     The Due Process Clause of the Fifth Amendment to the United States Constitution prevents the government from depriving individuals of a liberty or property interest without due process of law.

97.     Defendants revoked Ms. Colotl's DACA and, consequently, her work authorization, and denied her re-opened renewal request without providing her with a constitutionally adequate process.

98.     Defendants have violated Ms. Colotl's due process rights by revoking her DACA and denying her re-opened renewal application without providing her with a reasoned explanation for their decision that takes into account her responses to the agency's asserted reason for denial, or a reasonable opportunity to present arguments and evidence to demonstrate that she continues to merit DACA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays this Court to:

a.  Declare Defendants' denial of Ms. Colotl's re-opened application for renewal of DACA to be arbitrary and capricious and contrary to Defendants' procedures for adjudicating DACA applications;

b.  Enter an order restoring Ms. Colotl's DACA pending Defendants' re-adjudication of her application taking into consideration the relevant factors under the DACA program rules and following their own procedures for adjudicating DACA requests;

33

c.  Award Plaintiff's counsel reasonable attorneys' fees under the Equal Access

to Justice Act, and any other applicable statute or regulation; and

d.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: October 26, 2017

Danielle M. Claffey
Georgia State Bar No. 222292
Charles H. Kuck
Georgia State Bar No. 429940
KUCK IMMIGRATION
PARTNERS LLC
365 Northridge Road, Suite 300
Atlanta, GA 30350
Phone: (404) 816-8611
Fax: (404) 816-8615

Sean J. Young
Georgia State Bar No. 790399
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
GEORGIA, INC.
P.O. Box 77208
Atlanta, GA 33057
Phone: (770) 303-8111
Fax: (770) 303-0060

Respectfully submitted,

*/s/ Katrina L. Eiland*
Katrina L. Eiland*
Jennifer Chang Newell*
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
39 Drumm Street
San Francisco, CA 94111
Phone: (415) 343-0770
Fax: (415) 395-0950

Michael K. T. Tan#
Lee Gelernt#
David Hausman†
ACLU FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Phone: (212) 549-2660
Fax: (212) 549-2654

*Attorneys for Plaintiff*

* Admitted *pro hac vice*
† Application for admission *pro hac vice* pending
# Application for admission *pro hac vice* forthcoming